IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WARDELL LEROY GILES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-045-SLR |
| | ) |
| MEDICAL CONTRACTORS CMS, | ) |
| DEPUTY WARDEN PIERCE, and | ) |
| KATHY KIONKE, | ) |
| | ) |
| Defendants. | ) |

Wardell Leroy Giles, Laurel, Delaware. Pro Se Plaintiff.

James Edward Drnec, Esquire, Balick & Balick, LLC, Wilmington, Delaware. Counsel for Defendants Correctional Medical Services and Cathy Kionke.

Ryan Patrick Connell, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendant David Pierce.

**MEMORANDUM OPINION**

Dated: July 15, 2010
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Wardell Leroy Giles ("plaintiff"), now released, was incarcerated at the James T. Vaughn Correctional Center ("VCC"), Smyrna, Delaware, when he filed this lawsuit pursuant to 42 U.S.C. § 1983. He proceeds pro se and was granted leave to proceed in forma pauperis. Presently before the court are motions for summary judgment filed by defendants Correctional Medical Services ("CMS"), Dr. Cathy Kionke ("Dr. Kionke") (together "medical defendants"), and deputy warden David Pierce ("Pierce").[1] (D.I. 134, 138) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed, the court will grant the motions.

## II. BACKGROUND

Plaintiff filed this action against numerous defendants alleging a variety of claims. Most defendants and claims have been dismissed.[2] (D.I. 22, 108) The remaining allegations are that in September 2007, Dr. Kionke began a dental procedure on plaintiff and refused to complete it, even though Pierce requested that she do so. The dental procedure was completed one week later by a different dentist. After the incident, plaintiff wrote to Pierce who forwarded his complaints for investigation to a "medical guy." Plaintiff also filed grievances, but his complaints were classified as non-grievable. (D.I. 2, 6)

---

[1] The complaint names CMS as Medical Contractors CMS and incorrectly spells Dr. Kionke's first name with a "K".

[2] The clerk of court failed to terminate defendant HYRCI Classification Lady Doe. The court previously dismissed this defendant and the claims against her. (See D.I. 22) The clerk of court is directed to correct the docket to reflect her dismissal.

The Delaware Department of Correction ("DOC") contracts with CMS, a medical provider, to provide medical services to inmates. (D.I. 139, ex. A) On August 16, 2007, plaintiff submitted a sick call slip complaining that his back left tooth was "hurting real bad and a filling came out and the nerve is exposed and it's getting infected." (D.I. 83, AS23) He was seen on August 21, 2007 with complaints regarding tooth number 31. (D.I. 85, ex. A) Dr. Kionke examined plaintiff on August 28, 2007, following his complaints of pain in the lower right jaw. (D.I. 135, ex. C) She noted that tooth number 31 was decayed into the pulp and the nerve was dead, and recommended extraction. Plaintiff consented to the procedure. According to Dr. Kionke, there was no urgent need for the procedure. It was her intent to extract the tooth on September 6, 2007, but plaintiff was at court and the procedure was scheduled for the next week.

On September 11, 2007, plaintiff submitted a sick call slip complaining of "severe pain. My tooth is down to the nerve per the x-ray from dentist and I was told that I would be called last week to get tooth extracted. I can't sleep." (D.I. 83, AD229) Plaintiff presented on September 13, 2007 for the extraction. According to Dr. Kionke, before the extraction began, plaintiff attempted to remove an object from the tray of dental tools. (D.I. 135, ex. C) Dental notes indicate that plaintiff picked up an anesthetic carpule.[3] (D.I. 85, ex. A) Plaintiff's actions breached DOC security and Dr. Kionke was concerned for her safety. (D.I. 135, ex. C) She instructed plaintiff not to touch anything again or he would be asked to leave and not allowed to return. Dr.

---

[3] A capsule-like vessel containing the local anesthetic solution that is inserted into the syringe in preparation for an injection. http://www.answers.com/topic/carpule-anesthetic.

Kionke began the initial phase of extraction, but before she could elevate the tooth, plaintiff reached up to grab her hand. Dental notes concur that plaintiff raised his hand to grab Dr. Kionke. (D.I. 85, A) Dr. Kionke stopped the procedure and told plaintiff he would have to see another dentist.[4] (D.I. 135, ex. C) According to plaintiff, he "went to the dentist on the compound to get a tooth pulled and the dental lady did not give me enough pain [and numbing] medication. I told her she was hurting me when she started pulling the tooth so she told me to leave with tooth still half pulled in my mouth." (D.I. 2, D.I. 18, ex. D) An incident report of the occurrence indicates that plaintiff was dismissed and told to place a sick call slip when he was ready to behave appropriately. (D.I. 139, ex. A1)

Dental procedures necessarily involve sharp, metal tools and the second incident heightened Dr. Kionke's safety concerns. She adds that jostling or grabbing a dentist's hand during a procedure can cause substantial harm to the patient. According to Dr. Kionke, as a result of plaintiff's actions, she was unable to elevate the tooth and it was not "halfway extracted," nor was the nerve or root exposed. (D.I. 135, ex. C) She opines that on September 13, 2007 there was no immediate need for an extraction.

As Pierce was making his general rounds at the VCC he was approached by plaintiff who complained that Dr. Kionke had started to pull his tooth and then stopped after a partial extraction. Plaintiff showed Pierce the tooth, and it did not appear to him to have been upset from its original location or partially extracted. Pierce spoke to Dr.

---

[4]Dental notes state that Dr. Kionke told plaintiff to get out, but he did not want to leave and said he was sorry. (D.I. 85, ex. A) Dr. Kionke told plaintiff to get out or she would write him up. (*Id.*)

Kionke who relayed that when she began to apply the extraction tool, plaintiff reached up and grabbed her hand making her feel unsafe.[5] Dr. Kionke explained that she removed the tool without beginning to pull the tooth. Dr. Kionke indicated that she had administered plaintiff medication to numb the pain and, based upon her experience, was confident the quantity was more than sufficient. (D.I. 139, ex. A)

Pierce asked Dr. Kionke if she would complete the extraction if plaintiff agreed to keep his hands to himself; she refused, and indicated that there was no medical necessity to have the tooth removed right away. (*Id.*) Dental notes state that Pierce asked Dr. Kionke to reconsider, but she said "No!" and that plaintiff could put in a sick call to be treated by another doctor. (D.I. 85, ex. A) Pierce relied upon Dr. Kionke's opinion, noting her extensive experience performing dental procedures inside correctional institutions and routine performance of dental work without complaints or complications. Pierce informed plaintiff that Dr. Kionke would not see him again that day and cautioned him to never place his hands on medical staff who are trying to provide care. (D.I. 139, ex. A) Plaintiff returned to his housing area; he was later sent to medical and treated by "non-dental" medical staff.[6] (D.I. 6; 139, ex. A) He was given gauze to stop the bleeding and additional gauze to take to his cell, as well as pain medication. (*Id.*)

---

[5] Neither Dr. Kionke's affidavit, nor her dental notes, state that plaintiff grabbed her hand but, rather, that plaintiff reached up to grab her hand.

[6] Apparently this occurred on September 13, 2007, but medical records submitted to the court do not contain progress notes for that day.

The same day, plaintiff submitted a sick call slip complaining that his tooth was "halfway pulled and pushed with metal like object today and dentist did not finish [the] job." (D.I. 83, SD225) He complained that he "can't swallow hardly, ha[s] severe head, eye, and jaw pain, and can feel pounding in the nerve." (*Id.*) On September 15, 2007, plaintiff submitted a second sick call slip complaining that "it's been two days since the dentist left my tooth half pulled and refused to finish job, and my head and jaw area hurts real bad and I'm in severe pain. Pain medication is not working that much." (*Id.* at SD226)

September 18, 2007 dental notes state that plaintiff was ready to have the tooth extracted, returned to the OP list, and told to get pain medication. (D.I. 85, ex. A) He was given Ibuprofen for his complaints of pain. (D.I. 139, ex. A1) Dr. Sean Mercer ("Dr. Mercer") extracted the tooth on September 21, 2007. (D.I. 135, ex. B) Dental notes on the date of the extraction do not indicate that plaintiff's tooth was "halfway extracted" or that the process had begun in any measure. (D.I. 136, ex. B) Nor do the notes indicate that the root or nerve of the tooth was exposed or that there was any abnormality in presentation. According to Dr. Mercer, there was nothing out of the ordinary about the September 21, 2007 procedure and it was completed without complication. (D.I. 136, ex. B) On September 26, 2007 plaintiff had complaints of pain, but was healing well. (D.I. 140)

## III. STANDARD OF REVIEW

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The medical defendants move for summary judgment on the grounds that plaintiff's condition was not a serious medical need, Dr. Kionke was not deliberately indifferent, and plaintiff failed to provide evidence or allege that CMS established a

policy or custom of deliberate indifference causing plaintiff injury. (D.I. 134, 135) Pierce moves for summary judgment on the grounds that plaintiff cannot establish an Eighth Amendment claim against him, and he has Eleventh Amendment immunity in his official capacity and qualified immunity in his individual capacity. (D.I. 138, 139) Plaintiff appears to rely upon the record in his opposition to the motions. (D.I. 143, 145) See Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit in opposition to motion for summary judgment); Wilson v. Maben, 676 F. Supp. 581, 583 (M.D. Pa. 1987) (If allegations in a verified complaint are specific and based on personal knowledge, the complaint should be treated as an affidavit in support of, or in opposition to, a motion for summary judgment.).

## IV. DISCUSSION

Plaintiff alleges that Dr. Kionke began a dental procedure and refused to complete it in violation of the Eighth Amendment. He alleges that Pierce told him that he could not make Dr. Kionke complete the procedure because she worked for CMS. The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-105 (1976).

### A. Corporate Medical Defendant

Plaintiff makes no direct allegations against CMS and mentions it only in the caption of the complaint. When a plaintiff relies upon a theory of respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989); Miller v. Correctional Med. Sys., Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to

establish that CMS is directly liable for the alleged constitutional violations, plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of CMS' employee(s) have violated plaintiff's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

The record does not support plaintiff's claims that CMS violated his constitutional rights. There is no evidence that there was a relevant CMS policy or custom that

violated plaintiff's constitutional rights. For the above reasons, the court will grant CMS' motion for summary judgment.

## B. Individual Defendants

In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Prison administrators, like Pierce, cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d

Cir. 1993). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

Defendants argue that plaintiff's condition was not a "serious medical need because the eight-day window between treatments did not cause a "life-long handicap or permanent loss." They further argue that, although plaintiff had a condition that had been diagnosed as requiring treatment, the need for the tooth extraction was not so pressing that it necessarily had to be completed on September 13, 2007. In the Third Circuit, "[a] serious medical need is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003) (quoting *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987)) (citation omitted). A medical need is also serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," or a "life-long handicap or permanent loss." *Id.* at 273 (internal citations omitted).

Here, plaintiff was diagnosed by a dentist as requiring a tooth extraction. Hence, it cannot be said that the condition was not a serious a medical need. Therefore, the court turns to the issue of whether defendants were deliberately indifferent to that need.

With regard to Dr. Kionke, the record reflects that she attempted to provide plaintiff dental treatment on September 13, 2007, until he violated DOC rules. At that point, she feared for her safety. Safety in a prison setting is of paramount concern. Indeed, prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 527 (1979). While Dr. Kionke denied plaintiff treatment, she did so only after warning him that repeat behavior would result in his ejection from the dental area. Despite the warning, plaintiff's subsequent behavior caused Dr. Kionke concern over her safety. Notably, the record indicates plaintiff was told that, once he decided to adhere to prison regulations, he would receive dental treatment and that is precisely what happened. Plaintiff decided to adhere to DOC rules and he was placed on the tooth extraction list. The tooth was extracted a mere eight days from the date that Dr. Kionke stopped the dental treatment. During the eight days, plaintiff's condition was not ignored; he received medication to control the pain prior to rescheduling the tooth extraction. For these reasons, a reasonably jury could not find that Dr. Kionke violated plaintiff's constitutional rights.

Pierce argues that plaintiff cannot establish that he acted recklessly by consciously disregarding a substantial risk of harm to plaintiff, noting that he is not a medical care provider and there is no evidence of his deliberate indifference. Indeed, the record reflects that Pierce took steps to assist plaintiff in obtaining dental treatment. In doing so, he relied upon the dental expertise of Dr. Kionke regarding the tooth extraction and was justified in relying upon that expertise. As discussed above, Dr. Kionke did not violate plaintiff's constitutional rights. "[A]bsent viable claims that the

medical defendants violated his constitutional rights [plaintiff] cannot state a claim against the non-medical defendants for failure to cure the medical defendants' conduct." *Serrano v. Folino*, No. 08-2107, slip op. at 8 (3d Cir. July 29, 2009). For the above reasons, a reasonably jury could not find that Pierce violated plaintiff's constitutional rights.

After reviewing the record, the court finds that there is insufficient evidence to enable a jury to reasonably find for plaintiff on the issue of whether defendants were deliberately indifferent to his serious medical/dental needs. Therefore, the court will grant Dr. Kionke's and Pierce's motions for summary judgment.

## V. CONCLUSION

For the reasons discussed above, the court will grants defendants' motions for summary judgment. An appropriate order will be entered.